# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

FILED/REC'D

2023 MAY 17  A 10:14

CLERK OF COURT
U S DISTRICT COURT
WI WI

RON SCHILLING
Kettle Moraine Corr. Inst.
W9071 Forest Drive
Plymouth, WI 53073-0282,

    Plaintiff,

    -v-

WILLIAM B. KELLEY, M.D.
6001 W. Center Street
Milwaukee, WI 53210, and

WILLIAM McCREEDY,
Kettle Moraine Health Services
Unit Manager,
W9071 Forest Drive
Plymouth, WI 53073-0282, and

JOHN AND JANE DOES, and
Officer P. VANDER WAAL, and
Officer Z. SCHROEDER,
WI DEPT. OF CORRECTIONS
3099 E. Washington Avenue
Madison, WI 53707-7925, and

TONI L. STANLEY, MD, and
GEORGE A. CARBERRY, M.D., and
MARJORIE J. WEIS, R.N.
420 E. Division Street
Fond du Lac, WI 54935-4560, and

WI INJURED PATIENTS AND
FAMILIES COMPENSATION FUND
125 South Webster Street
Madison, WI 53702,

    Defendants.

23-cv-331-wmc

Case No. _____

Classification Code. <u>30705</u>

---

**COMPLAINT**

---

I, Ron Schilling, plaintiff, *pro se*, as captioned above, hereby files this complaint pursuant to civil procedure and 42 U.S.C. §1983, and hereby shows the Court the following:

## PLAINTIFF

1. The above named plaintiff is and was at all times mentioned herein, a prisoner of the Department of Corrections (hereafter DOC), and currently resides at the Kettle Moraine Correctional Institution (hereafter KMCI), located at the address captioned above.

## DEFENDANTS

2. The above named defendant, William B. Kelley, was the treating physician at the KMCI Health Services Unit (hereafter HSU) during the times mentioned herein, and as such was responsible for the safe operations of medical procedures. Further, Dr. Kelley is credentialed as a general surgeon in Milwaukee, Wisconsin and affiliated with multiple hospitals in the area, including Ascension SE Wisconsin Hospital - St. Joseph Campus and Aurora Sinai Medical Center, and received his medical degree from St. Louis University School of Medicine and has been in practice for more than twenty (20) years. And further, Dr. Kelley has expertise and experience with healthcare policy, including knowledge of the risk of harming patients when mandatory sterilization procedures are not strictly adhered to, including the unavoidable link between improper sterilization and the onset of infection such as was experienced by plaintiff, and was further aware, or should have been aware, that plaintiff needed to be seen at his scheduled follow-up examination. At all pertinent times Dr. Kelley was acting under color of state law.

3.  The above named defendant, William McCreedy, was the HSU Manager and functioned as HSU Supervisor/Director at KMCI and was at all pertinent times mentioned in this complaint responsible for the safe and necessary medical care of plaintiff while incarcerated at KMCI under DOC care.  In concert with KMCI Security Staff, he was responsible for scheduling and otherwise managing the follow-up examination at issue in this matter.  At all pertinent times he was acting under color of state law.

4.  The above named defendants, John and Jane Does, and Officers P. Vander Waal, and Z. Schroeder, are all Wisconsin DOC employees, and were and are at all times responsible for the safety of plaintiff, not only while incarcerated as a person under their care, but also during medical transport, including the medical procedures at issue in this matter.  At all pertinent times they were acting under color of state law.  The transport officers John and Jane Does names are currently unknowable.

5.  The above named defendant, Toni L. Stanley, MD, originally performed the medical ablation procedure at issue at Fond du Lac Regional Clinic, SC.  At the same Clinic are also above named defendants, George A. Carberry, MD, and Marjorie J. Weis; named as the authors of the fraudulent evidentiary documents evidenced in this matter, attempting to conceal liability surrounding the fact of their failure to conduct plaintiff's scheduled follow-up examination.  As such, they were acting under color of state law and in their professional capacities, and also in their personal capacities concerning the personal fabrication of said fraudulent documents and the reasons therefor.

6.  That the Wisconsin Injured Patients and Families Compensation Fund (hereafter Fund) is a statutorily established risk-sharing pool with its principal place of

business located at 125 South Webster Street, Madison, Wisconsin 53702, and as such, the Fund is jointly and severally liable for that portion of any award of damages caused by the negligent actions or omissions of the defendants that falls within the prescribed level of liability.

## NATURE OF THE CASE

7. This is a civil action brought forth by the above captioned plaintiff, seeking legal redress pursuant to 42 U.S.C. §1983, for violation of the protections against cruel and unusual punishment, under the aegis of the Eighth Amendment to the United States Constitution, and the deliberate indifference to the risk of serious physical harm and the deprivation of plaintiff's necessary medical needs. The defendant's actions and omissions cumulatively failed to take necessary precautions and implement preventative measures necessary to protect plaintiff from serious near-death harm.

8. The serious medical need claim arises when the defendants failed – despite being aware of the clear and obvious medical needs of plaintiff – to provide or meet the required and necessary medical care standards; to adequately furnish the continued and prescribed follow-up medical examination, diagnosis and treatment, and subsequently and deliberately fabricated documents attempting to conceal their failure to conduct said follow-up examination, violating plaintiff's Eighth Amendment rights as mentioned above, and triggering the statute of limitations period for legal redress. At all times mentioned herein the defendants acted under color of state law.

## JURISDICTION AND VENUE

9. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 2201, 2202, 2283, and 2284, in addition to all other stated claims as a result of the defendant's

tortious negligent actions and omissions. And venue is properly brought in the Western District of Wisconsin, located in Dane County, Wisconsin, applying the traditional *forum non conveniens* principle.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff timely filed his Notice of Claim (hereafter NOC), and has exhausted the Inmate Complaint Review System (hereafter ICRS) grievance procedure, knowing the relief sought is not available through either venue. Plaintiff also made a formal Request For Mediation Panel to be convened. Copies of these documents proving notice and exhaustion are submitted herewith. (See, Exhibits 1, 2 and 3, respectively.)

## STATEMENT OF CLAIM

11. That the chronology of events precipitating the lengthy series of negligent acts leading to the injuries and damage in this matter originated when plaintiff was handcuffed and shackled and transferred to the defendants medical facility on 040418 for a simple venous ablation procedure on his leg, performed by the above-captioned doctors (named collectively hereafter defendants). (See, Exhibits 4, submitted herewith.)

12. That the possibility of contracting infection was only *briefly* mentioned, and was certainly not disclosed to plaintiff that the medical procedure would put him at significantly *increased* risk of the danger of contracting a deadly infection due to the increased incidents of said infection from contaminated surgical utensils, or contaminated surgical gowns, or contaminated surgical wipes and/or other means of infection transmission at their medical facility. (See, Exhibit 5, submitted herewith.)

13. The defendants had a duty to plaintiff to exercise due care in selecting its staff, and to conduct medical procedures within proper medical standards as applied to all

persons in the medical industry, including the duty to inform plaintiff of the fluctuating infection problems at their facility.

14. That defendants breached said duty by failing to inform plaintiff so an informed decision could be made regarding postponing the operation for a later date, or exercising the opportunity to select another facility to conduct the operation.

15. That the defendants were negligent when disregarding their ministerial duty and obligation to so inform plaintiff as part of the informed consent process as provided in Wis. Stat. §448.30.

16. Defendants also breached their duty by failing to comply with current infection control guidelines, and the mandatory conditions set forth in §§DHS 124.08(2), (4)(b) and (e), Wisconsin Administrative Code (hereafter Code).

17. The Code requires that hospitals maintain a sanitary environment, that sterilizing services be available at all times, and that a committee be established at each hospital facility to implement measures to make sure infections do not spread.

18. The defendants violated plaintiff's constitutional rights, regardless of whether they followed the State statutory provisions or their internal policies, inasmuch as 42 U.S.C. § 1983 protects plaintiff from constitutional violations, and not so much violations of state law or departmental regulations.

19. That defendants did not test or otherwise adequately monitor for infection prior to or during the procedure, and failure to do so is evidence of medical negligence.

20. That defendants also had a duty to plaintiff to use the necessary caution against the spread of infection by assuring the entire operating field was sterile in preparation for the surgical procedure.

21. That pursuant to DOC Policy, Defendants John and Jane Doe did not remove the unsterile shackle from plaintiff's leg so the operating field could be properly sanitized to facilitate a sterile work environment for the surgical team.

22. Defendants John and Jane Doe stated their policy at the time provided that restraints could not be removed unless the patient was anesthetized and unconscious.

23. That the above-mentioned Policy disregards and even prohibits the care and caution against infection during surgical operations, and has since been revised and ratified to remove such a shackle and secure it to the bed rail.

24. All defendants had a duty to plaintiff to assure the complete sterilization of the surgical site by having the removal of security restraints prior to conducting the sterilization procedure and actual surgical leg operation.

25. As a result of the above-mentioned negligence plaintiff's potentially contaminated pants, shoes, socks and underwear were a mere inches from the venous ablation surgical operation taking place.

26. That with two security officers present, said restraints could have easily been removed from the left ankle and secured to the bed rail, to allow for the proper sterilization of the left leg area prior to surgery.

27. That the surgical defendants were negligent and did not use the care and caution against infection required by good surgical practice, and at one point during the ultrasound procedure one of the surgical team actually grabbed plaintiff's foot and ankle (beneath the unsterile pant leg, sock and shackle) and turned his leg slightly, only to return to the operating field to insert another needle and inject more Lidocaine numbing agent.

28. That by reason of such unskilled and improper conduct during the operation procedure, defendants violated plaintiff's expectancy that they would follow reasonable care and skill in sterilizing their equipment and maintaining a sterile operating field.

29. That failure to maintain adequate safety and sanitary conditions is a failure to comply with current infection control guidelines.

30. As a consequence of such wrongful and neglectful conduct defendants introduced infection into plaintiff's blood eventually causing severe damage and traumatic pain, physical suffering, mental anguish, and great physical and psychological damage to plaintiff.

31. That as initially identified by defendant Kelley, and as admitted to by the infection expert at UW-Madison Hospital (See Exhibits 6, submitted herewith), the infection during the initial surgery manifested from the germs introduced by the unsterile conditions, and was the proximate cause and result of the negligence mentioned above.

32. That plaintiff did not have an infection prior to arriving for the leg operation, and there was "no urgency" for the procedure, and was therefore at "low risk" and a "good candidate for the procedure" (See, Exhibits 7, submitted herewith.)

33. That as a result of the ablation surgery in this matter, plaintiff began showing symptoms of injury and infection immediately after surgery. (See, Exhibits 8, submitted herewith.)

34. That the chronology of events also involve details concerning plaintiff's initial post-operative verbal complaints and requests for medical attention made to other known and named, and unknown John and Jane Doe DOC employees at KMCI.

35.   That numerous DOC John Doe defendants working on plaintiff's housing unit were negligent in ignoring plaintiff's verbal complaints and requests for medical attention, which allowed for the continuum of negligence resulting in the cascading injuries, pain and suffering experienced by plaintiff as the delayed diagnosis of the exponentially increasing infection progressed unabated and untreated.

36.   That the exact timing of said verbal requests remains somewhat foggy due to the nature of the injuries manifesting at the time, bringing plaintiff ever closer to delirium, disorientation and death; to wit, importantly, the incredible cognitive disconnect in addition to the swelling of plaintiff's hand, hip, neck, throat, carotid region and clavicle area caused by the exponentially increasing infection ravishing his body.

37.   That the DOC defendants negligently failed to initially assess or respond to plaintiff's injuries and infection despite being repeatedly shown the increasing infectious swelling continuing to debilitate and incapacitate plaintiff to where he had to hug the wall to ambulate the hall to the bathroom, and that as a result of said failure the DOC defendants further failed to obtain a consultation from HSU concerning the symptoms of injury and exponentially increasing infection exhibited by plaintiff.

38.   That importantly, unbeknownst to plaintiff, following the surgical procedure at issue, it was ordered and scheduled that plaintiff be brought back to the medical facility for a follow-up examination within 48-72 hours.  (See Exhibits 4 & 9, submitted herewith.)

39.   That plaintiff was supposed to be seen for said follow-up appointment within 48 – 72 hours of the surgery to potentially diagnose any ongoing medical complications, but that appointment was never kept despite the fabricated fraudulent documentation

suggesting otherwise, and said negligence fell shockingly below the applicable standard of medical care.

40. That the follow-up examination order was ignored by all subsequent defendants at KMCI.

41. That the clinic defendants likewise ignored the scheduled follow-up examination order and, instead, at some later point fabricated documents alleging plaintiff was seen at the follow-up examination on 040618 and, further, postulating that there were no further medical complications when quite the diametrical opposite was true, as plaintiff remained at KMCI, and that defendant Kelley even initialed the fabricated document on 041018. (See, Exhibits 10, submitted herewith.)

42. That failing to produce plaintiff at the ordered and scheduled follow-up examination precluded any possibility to diagnose and treat the deadly infection coursing through plaintiff's entire body at exponential rates.

43. That failure to maintain adequate safety and sanitary conditions at the initial medical operation caused the deadly infection to set in, and ignoring the prescribed follow-up examination inevitably lead to a cascading series of serious medical problems resulting in great bodily harm, physical damage, pain and suffering to plaintiff, as well as compromised functional mobility due to swelling in the hand and fingers, hip joint and clavicle joint, and impingement upon the throat and carotid region, all of which followed the substandard care.

44. That as evidenced by institution documentary evidence, including off site referrals, temporary release travel log documents, security gate logs and numerous surveillance camera footage, the plaintiff never left KMCI, and was never brought to the

defendant's facility for said follow-up examination on 040618, and that the Off-Site document was signed by defendant Kelley on 040218, and subsequently initialed by defendant Kelley on 041018 (See, Exhibits 11) and, in fact, plaintiff never left KMCI after returning from the surgical ablation procedure on 040418, and suffered increasingly painful and cascading symptomology as the deadly infection contracted at the defendant's facility continued to escalate and exponentially increase for some six (6) days, infecting ever more of plaintiff's entire body, resulting from the delayed diagnosis of the infection to where it progressed unabated and untreated.

45.  That the fabricated fraudulent documents created by defendants attempt to suggest that the follow-up appointment *was* kept, despite all evidence to the contrary, and were created by the defendants in an attempt to assert that plaintiff was examined on 040618 when, in fact, he was not.  Moreover, the fabricated fraudulent documents were constructed in blatant disregard of the truth while attempting to conceal the fact of their liability.

46.  That it was in fact these documents which exposed the fact that the named defendant doctors authoring the fraudulent documents were directly responsible for the subsequent damage and injuries suffered by plaintiff.

47.  That the fraudulent fabricated documents mentioned above were discovered on 060122 (See, Exhibits 12, affidavit of attorney Jason Franckowiak, submitted herewith), and removed all doubt as to the defendant doctors' liability, and triggering the statute of limitations period for said violation, being the last in a lengthy series of negligent acts.

48. That plaintiff's claim is being filed within the five-year statute of repose, which refers to the date of the "act or omission," and does not specify that the five years run from the first negligent act.

49. That under the "continuum of negligent care" doctrine, a cause of action cannot be divided and does not accrue until the *last* negligent act or omission in a series of negligent acts or omissions.

50. That the injury to plaintiff was the misdiagnosis, or the missed opportunity to diagnose, and not so much the infection itself, because if plaintiff's infection had been diagnosed earlier, he would have had a better chance to halt the damage from all the subsequent injuries.

51. That plaintiff's omission and negligence claims did not completely accrue until served with the defendant's fraudulent documents attempting to depict the alleged attendance at the follow-up examination, and the subsequently missed diagnoses.

52. That failure to perform the medical follow-up examination is itself medical malpractice, and falls well below the standard of care which should have been provided.

53. That had plaintiff been seen for the scheduled follow-up appointment the examination could and would have revealed exponentially evolving deadly infection, which could and would have resulted in immediate diagnosis and treatment, which could and would have prevented much of the injuries, damage and suffering sustained by plaintiff.

54. That had plaintiff's initial verbal requests for medical assistance been honored it could and would have revealed the evolving deadly infection, and could and

would have led to immediate treatment that could and would have saved the majority of plaintiffs injuries, pain and suffering.

55.    That had plaintiff's initial verbal requests for medical assistance been honored the vast majority of the trauma and continued harm, damage, pain and suffering could and would have been avoided.

56.    That as a result of the continued negligence experienced by plaintiff, his condition worsened with the passage of time, and that as such he was subject to exponentially increasing levels of infection throughout his entire body, and he has and is suffering permanent disability in the form of cosmetic deformity from various surgeries, in addition to experiencing pain and suffering occurring then, now and into the future due to his permanent impairments, including the anxiety over the severe losses incurred, and the additional medical, surgical and other expenses which he will doubtless incur in the future.

57.    That the above negligent acts fell below standard medical care, were inherently negligent, and were a substantial factor in causing plaintiff's injuries, pain and suffering, and causing other damages sustained by plaintiff, as well as future damages, pain and suffering.

58.    That after experiencing the continuing neglect, and not being able to write or type with his right hand because of the swelling and immobility, on 040818 plaintiff was finally able to finish fashioning a typed letter with his left hand to the KMCI treating physician documenting the continuing problems in detail, enunciating as best he could the exponentially increasing swelling, pain and suffering; that he was having trouble breathing and swallowing because of the clavicle, neck and throat swelling, and having

difficulty trying to walk due to the painfully swollen hip joint. (See, Exhibits 13, submitted herewith.)

59. That the next morning plaintiff was finally driven to HSU after initially being told to "do the best you can to walk there" – an uphill distance of a quarter mile.

60. That plaintiff's treating physician determined the chronology of events made the defendants actions traceable to the infection sustained during the initial ablation operation and, consequently, ordered plaintiff be returned to the defendant's healthcare facility.

61. That after the subsequent assessment plaintiff was immediately return-transferred by the DOC defendants and admitted to the defendant's healthcare facility on 041018, to obtain emergency diagnosis and treatment of the infection trauma, injuries and damage caused by the initial ablation procedure on his leg. (See Exhibits 14, submitted herewith.)

62. That plaintiff was confined to a bed and thereafter subjected to numerous diagnostic procedures, and this was the first instance of any mention of antibiotic being ordered for plaintiff. (See Exhibits 14, *supra*.)

63. That despite unsuccessful initial measures to diagnose and arrest the obvious infection plaguing plaintiff's condition, he experienced a continuum of neglect as his health continued to decline to a point where he was subject to eventual emergency ambulatory transfer to the University Hospital in Madison on 041118, where he was subject to numerous surgeries to stabilize his emergency condition. (See Exhibit 15, submitted herewith.)

64. That subsequently plaintiff was subjected to numerous other diagnostic procedures, concluding with the prognosis that in addition to the aforementioned hand, hip and clavicle joint damage, the infection was also attaching itself to plaintiff's heart and caused the tissues of plaintiff's aorta to weaken, causing a bulging aneurism in the thoracic aorta and severely damaging the ascending carotid and shoulder vessels.

65. That such a condition was subsequently deemed "terminal."

66. That most if not all of the horrendous medical problems from said terminal condition could have been avoided if plaintiff had been examined at the follow-up examination and subsequently treated in timely fashion.

67. That resulting from the trauma suffered from the "terminal" condition mentioned above, severe psychological trauma manifested when the DOC defendants subsequently placed plaintiff on a "death bed" status, securing a wrist bracelet emblazoned with "DO NOT RESUSCITATE," and even packing up all of plaintiff's personal property at KMCI and assigning his coveted single-cell to another prisoner.

68. Defendants failed to exercise reasonable care and skill in treatment and was the proximate cause of cascading physical injuries culminating in the infection which caused the damage to the hand and fingers, hip and clavicle joints, and the weakening of the tissue of the vessels surrounding the heart, causing a bulging aneurism in the ascending thoracic aorta which, then, led to numerous surgeries to remove infected flesh and bone, culminating in the 12-hour open heart surgery, where a cadaver-donated aortic patch and vessels were grafted into place, and even more of the surrounding infected flesh was removed with the clavicle joint itself. (See, Exhibits 16 & 17, submitted herewith.)

69.   That regaining consciousness in the ICU recovery unit was increasingly traumatic due to DOC defendants continued antagonistic behavior; turning ignorant cartoons on the television and blasting the volume as plaintiff attempted needed sleep, and repeatedly confiscating the "coughing pillow," used to hug the stapled sternum closed and in place while coughing phlegm after the heart and other surgeries, and then antagonizing plaintiff to complain.

70.   That after strenuous and concerted efforts at recovery, on 050118 plaintiff was transported to the Dodge Correctional Institution (hereafter DCI), and placed on the infirmary ward for recovery while hooked to an intravenous antibiotic machine, and another machine creating vacuum for the "wound vac" patch covering and holding together the stapled sternum wound, and was subsequently doubled up with another prisoner who proved to be utterly incompatible. (See, Exhibits 16 & 17, *supra*.)

71.   That plaintiff's prescribed pain medication was subsequently withheld and changed to the much less effective Tylenol, increasing pain and anxiety.

72.   That on 050318 plaintiff was transported from DCI via "hot" ambulance to the Waupun Memorial Hospital after suffering a frightening ordeal with Atrial Fibrillation caused by the additional stress from unabated pain resulting from the withholding of prescribed pain medication; that said transport took exactly one hour for a two-block trip because of all the security measures brought into play.  After diagnosis and treatment plaintiff was returned to DCI the next day.

73.   That the surgical ablation procedure was the proximate cause of infection, and in conjunction with the above continuum of negligence was a proximate result and substantial factor in causing plaintiff to suffer severe and exponentially increased levels

of infection requiring multiple, painful treatments and surgeries and other escalating damages, pain and suffering, including permanent physical and mental disability, and cosmetic deformity due to multiple incisions and skeletal deformities from the various surgeries needed to remove infected flesh and bone.

74.    That the initial spreading infection was thus occasioned by medical negligence and the continuum of negligence by all defendants, which ultimately allowed for the negligent treatment resulting in all the escalating medical problems, the most of which could have been alleviated by producing plaintiff at the follow-up examination.

75.    That plaintiff continues to suffer the damages mentioned above, including the loss of 30+ pounds of muscle mass, subsequent breathing problems with COPD, and severely reduced overall health wellness from not being able to exercise as he was accustomed to, in addition to general PTSD symptoms resulting from the severe emotional trauma suffered, all of which will require further therapy and continued treatment for the rest of his life.

76.    That while at DCI Infirmary, plaintiff suffered continued physical and mental health problems associated with the physical and psychological trauma resulting from the above damages, and these mental health problems were continually neglected and ignored. (See, Exhibits 18, submitted herewith.)

77.    That plaintiff was at DCI until the PIC line was removed for the IV antibiotic drip, and he was subsequently returned to KMCI to a double-occupancy cell.

78.    That after returning to KMCI plaintiff's medical concerns were continually restricted, neglected and ignored, even for things as relatively minor as permission to retain an extra pillow for pain during coughing, and better positioning for sleeping with

hip pain, and for permission to continue Ensure for the weight-loss and gut problems associated with extensive use of antibiotics, or reinstating the "ride" status for HSU appointments. (See, Exhibits 19, submitted herewith.)

79. That plaintiff will doubtless experience continued pain and suffering into the future due to his permanent impairments and his anxiety over future surgeries currently being denied by DOC (as mentioned in ¶¶40-43 of Notice of Claim), and incurred hospital and medical and other expenses he will necessarily incur well into the future. (See, Exhibits 20, submitted herewith.)

80. That as a result of the above continued negligence plaintiff has and will continue to sustain loss of society and companionship into the future.

81. All of the pain and suffering and lamentable results following therefrom were due to the infection caused by the defendants' initial failure to exercise the necessary reasonable sanitary care and skill required under such conditions, and the failure to produce plaintiff at the follow-up examination.

82. That the prescribed actions of each defendants' standard level of medical care were intended to prevent the very types of infection, injuries, pain and suffering experienced by plaintiff, and their negligence requires they be held accountable.

## LEGAL RIGHTS VIOLATED

83. That all defendants violated plaintiff's right to have medical procedures conducted in full accordance with the accepted standards of care which have been long standing and secure, providing the absolute and well defined duty of all defendants to exercise due caution and care of plaintiff.

84. That all the defendants ignored their ministerial duties which must be adhered to concerning medical standards for maintaining sterile and safe operating conditions, resulting in violations of plaintiff's Eighth Amendment protections.

85. That all defendants breached the duties to plaintiff by failing to comply with mandatory protocols providing infection control, and advising plaintiff of the actual risks from the ongoing infection problems at their facility, further violating plaintiff's Eighth Amendment protections.

86. That as a consequence of defendants medical malpractice and negligence a layperson could conclude as a matter of law and common knowledge it would cause infection to set in as that which occurred in the instant matter when proper sterilization procedures were not adhered to.

87. That all defendants have injured plaintiff by eliminating a significant portion of plaintiff's quality of life, and overall life expectancy.

88. That all defendants further injured plaintiff by severely limiting his ability for future earnings, and his ability to support himself.

89. That all defendants have subsequently traumatized plaintiff by diminishing his mental and physical wellness.

**RELIEF SOUGHT**

90. That Tort law in a nutshell, and the very Constitutional tenets of justice demand that plaintiff be made whole.

91. For his injuries, pain and suffering, and also for his future medical burdens, reduced quality of life, as well as his reduced ability to earn a living and provide for himself, plaintiff seeks adequate monetary compensation from defendants.

92. For his injuries, pain and suffering, and also for his future medical burdens, reduced quality of life, as well as his reduced ability to earn a living and provide for himself, plaintiff seeks adequate monetary compensation from DOC.

93. Plaintiff also seeks monetary damages for the unnecessary infliction of psychological trauma by DOC when callously disregarding plaintiff as deceased; placing a "DO NOT RESUSCITATE" bracelet on his wrist in the hospital, and essentially postulating that his life was no longer worth redeeming, and then repeatedly antagonizing plaintiff as he was recovering.

94. Plaintiff also seeks compensatory and punitive damages from DOC for their negligent actions enumerated herein, and for unnecessarily causing additional traumatic pain and suffering, including depriving him of the prescribed pain medication six days after his open heart surgery, and depriving necessary surgeries.

95. Plaintiff requests the compensatory and punitive damages be determined by a Jury.

96. Plaintiff requests injunctive relief enjoining defendants' actions, and preventing this scenario from recurring in future operations.

97. Plaintiff requests that Attorney fees be awarded, should one appear or be appointed in this matter.

98. Plaintiff further requests any and all other forms of relief the Court deems appropriate.

**WHEREFORE**, the plaintiff demands judgment against the defendants, jointly and severally as follows:

A. On behalf of plaintiff, for reasonable compensatory damages in an amount determined by the jury;

B. Against all defendants, jointly and severally, for reasonable punitive damages in an amount determined by the jury;

C. Against all defendants, jointly and severally, for the loss of livelihood, the loss of companionship, the loss of future earnings, the costs of future medical procedures, current and future pain and suffering, and the expenses incurred therefrom, on behalf of plaintiff, for reasonable compensatory damages in an amount determined by the jury;

D. Against all defendants, jointly and severally, for plaintiff's costs, disbursements and fees as provided by law;

E. An injunctive Order admonishing the defendants and enjoining them from similar action, and to correct their infection problems pursuant to law.

F. Such other relief as the Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY BY TRIAL BEFORE A PANEL OF SIX JURORS.**

This Plaintiff does not currently have access to a notary public, but submits the foregoing as truthful and honest to the best of his ability and understanding, and under the penalty of perjury pursuant to the court holding in **Carter v. Clark**, 616 Fed.2d 228 (5th Circuit 1980), and **Ray v. Clements**, 700 Fed.3rd 993 (7th Circuit 2012), and that the foregoing declaration is in substantial compliance with Title 28 USC 126.

Respectfully submitted this _15_ day of _May_, 2023.

_Ron Schilling_
Ron Schilling
Plaintiff, *pro se*